**FORM 1**

## UNITED STATES DISTRICT COURT

### DISTRICT OF CONNECTICUT

Tyson Hunter

v.                                    CIVIL CASE NO. 3:02-CV-340 (EBB)

Brian K. Murphy

### NOTICE OF APPEAL

1. Pursuant to F. R. A. P. 4(a)(1), Tyson Hunter hereby gives notice and
   (appealing party)

appeals to the United States Court of Appeals for the Second Circuit from the following

Judgment or Order (attach the Judgment or Order):

See Attached

2. The Judgment /Order in this action was entered on September 18th 2003 .
   (date)

Tyson Hunter
**Signature**

Tyson Hunter
**Print Name**

1153 EAST ST South

SUFFIELD, CT 06078
**Address**

Date: 2/3/64                           N/A
                                       **Telephone Number**

Note: You may use this form to take an appeal provided that it is received by the Office of the Clerk of the U.S. District Court within 30 days of the date on which the judgment was entered (60 days if the United States or an officer or agency of the United States is a party).

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

TYSON HUNTER,                    :
    Petitioner               :
                             :
    v.                       :    3:02CV340 (EBB)
                             :
                             :
BRIAN K. MURPHY,                 :
    Respondent               :

## RULING ON PETITIONER'S MOTION UNDER 28 U.S.C. SECTION 2254

### INTRODUCTION

Tyson Hunter (hereinafter "Hunter") has filed a Petition for Writ of Habeas Corpus pursuant to Title 28 U.S.C. § 2254. The sole claim contained in his motion is that Hunter was denied his constitutional right to present a complete defense at his trial.

### BACKGROUND

### I.   STATEMENT OF RELEVANT FACTS

The Court sets forth only those facts deemed necessary to an understanding of the issues raised in, and the decision rendered on, this Motion.

On January 25, 1999, Tyson Hunter went to trial charged with the murder of Addies Grimsley.  The testimony at Hunter's trial established that, during the early morning hours of October 13, 1997, Addies Grimsley was shot and killed in Waterbury, Connecticut.  Grimsley was one of three people in a gold-colored

Ford Escort that was chased onto a dead end street in Waterbury by a group of individuals in a grey Toyota Corolla. When Grimsley exited the Ford, after it struck the guardrail at the end of the road, at least five shots were fired and Grimsley shouted, "I've been hit." Grimsley sustained several gunshot wounds and bled to death from a bullet that struck his upper thigh, cut his femoral artery and tore a large hole in an adjacent vein.

At Hunter's trial, witnesses identified Hunter as the person who was seated in the front passenger seat of the Toyota and others identified that passenger as the one who had fired the fatal shots.

Steve Dunbar testified that he knew Petitioner because they had grown up together and that, about 11:30pm on October 12, 1997, as he was walking his dog in front of his home, he saw Damian Ellis carrying a black book bag to a gray Toyota. Dunbar testified that he thought the bag sounded as if it contained shells and guns, and he heard Ellis say "it's on." Dunbar saw Ellis give the bag to the Petitioner, who was standing outside a gray Toyota with three other men . Ellis then drove off in a dark colored Acura, while the petitioner and the three other men drove off in the gray Toyota.

When Dunbar returned to his house, he contacted his friend Officer Michael Tripp of the Waterbury Police Department and

warned him that something was about to happen.

After speaking with Officer Trip, Dunbar went back outside with his dog. About an hour or an hour and a half later, Dunbar heard several gunshots coming from the direction of Berkeley Avenue. He then saw a new, "mustard colored" Ford Escort, followed by the gray Toyota, coming from the direction of Berkeley Avenue. Dunbar saw the Petitioner in the passenger seat of the gray Toyota and three other men in the car with him. Dunbar went back into his house and heard more gunshots. He then saw the gray Toyota drive away at a high speed, now with only three occupants.

Jason Hawk testified that he was driving a gold Ford Escort during the early morning hours of October 13, 1997, with Efrem "Duke" Collins. The Escort belonged to Grimsley. Hawk and Collins picked up Grimsley, who agreed to let Hawk and Collins continue to use the car, but asked that he be dropped off at Berkeley Heights. On the way to Berkeley Heights, Hawk noticed a car with a loud engine following them. Hawk began to accelerate and someone in the Toyota fired a shot that went by Hawk's ear. The Toyota pursued and tried to pass the Escort, and more shots were fired at the Escort from the Toyota. Collins told Hawk that it was "Tyson and them" doing the shooting. (T. 1/26/99 at 210). Hawk drove the Escort into a parking area and Hawk then jumped out of the moving vehicle and fled into a wooded area.

3

Meanwhile, the Escort struck a guard rail at the end of the parking area. During his testimony, Hawk identified a photograph of the gray Toyota Corolla as the car that was following them.

Efrem Collins testified that he spent a couple of hours driving around Waterbury in the gold Escort on the night of October 12, 1997. Collins testified that he saw a particular gray Toyota on two occasions over the course of the night. The first time, a gray Toyota with four occupants chased the Escort, but Collins and his companions were able to lose the Toyota. Collins further testified that the driver of the Toyota was a "Spanish Kid" named "Zeus," but he denied recognizing any of the other occupants. However, in his earlier statement to the police, Collins indicated that the Petitioner was in the front seat of the Toyota when the first chase occurred.

Collins saw the Toyota again at about 1:00am on October 13, 1997. At this time, Collins was riding in the Escort with Hawk and Grimsley. After noticing the Toyota, Collins told his companions that it was the same car that had chased them earlier. Collins testified that the "Spanish person" was still the driver of the Toyota but that he did not know the identity of the passenger in the front seat or the other two passengers. Once again, however, he had indicated in his prior statement to the police that Petitioner had been in the passenger seat of the gray Toyota.

4

Collins testified that during this second encounter the people in the Toyota began shooting at the Escort and one of the shots went through the back window. When Collins looked back, he saw a black person in the passenger's seat with a gun out the window. Hawk drove into a parking area, turned into a dead-end, and jumped out of the moving vehicle. The Escort then crashed into a fence. Collins remained in the car. Grimsley tried to climb out of the car and was shot after he exited the vehicle.

As previously noted, there were inconsistencies between Collins' testimony at trial and Collins' sworn statement to the Waterbury police. The statement was admitted into evidence under the <u>Whelan</u> doctrine.[1] The statement was made on October 14 after Collins was picked up from school by detectives. The statement provided much more detail about the events of the night/morning in question and specifically identified petitioner as the person who had shot Grimsley. The statement also indicated that Collins had not called the police because "Tyson is crazy and is always shooting at people." (T. 1/27/99 at 41).

Jesus Alvarez was expected to be the state's key witness.[2]

---

[1] <u>See</u> <u>State v. Whelan</u>, 200 Conn. 743 (1986). A prior inconsistent statement may be used at trial for substantive as well as impeachment purposes where the statement is signed by a declarant, who has personal knowledge of the facts stated within that statement, and who testifies at trial and is subject to cross examination. <u>Id.</u> at 753

[2] Alvarez had, prior to Hunter's trial, pleaded guilty to a charge of conspiring with Hunter to commit the murder of Grimsley and had been sentenced to ten years in prison.

5

However, on the stand, Alvarez testified that he could not recall the events that had transpired on October 12 and October 13, 1997. Alvarez did, however, acknowledge that he had signed and initialed a sworn written statement to the police dated October 14, 1997.

In this statement, Alvarez admitted to driving the Toyota and Alvarez identified Hunter as a passenger in the Toyota. Alvarez stated that when the Ford had come to a stop against the guardrail, Hunter fired in excess of ten shots. Subsequently, Alvarez heard Grimsley yell, "I've been hit."

At Hunter's trial, however, Alvarez testified that he had never read the statement, had been under the influence of hallucinogenic drugs when he signed it, and that the police had coerced him into signing the statement which he claimed was prepared by the police outside of Alvarez's presence. Alvarez also testified that he was not involved in the murder and that he did not even see Hunter on the night of the killing. After Alvarez's direct testimony had concluded, the trial court admitted his written statement for substantive purposes under the Whelan doctrine.


**Hunter's Defense**

Hunter's defense was essentially that he was not in the Toyota at the time of the killing. Hunter attempted not only to

6

establish an alibi for himself, but to establish an alibi for Jesus Alvarez, the state's key witness. Hunter sought to establish that Alvarez was not in the Toyota and therefore could not possibly identify Hunter as the front seat passenger that shot and killed Addies Grimsley. Hunter's attempt to introduce evidence of Alvarez's alibi was frustrated because the trial court excluded testimony of alibi witnesses for Alvarez and the trial court also excluded a video surveillance tape from a convenience store that Hunter claimed showed Alvarez was not in the Toyota.[3]  This evidentiary ruling is the basis of Hunter's habeas petition.

On cross-examination Hunter questioned Alvarez about his whereabouts on the night/early morning of the murder. Hunter also questioned Alvarez about his written statement to the police. Alvarez testified that he took no part in the car chase or the shooting that killed Addies Grimsley. He described in some detail where he was the entire night of Grimsley's murder. Alvarez claimed that he was with friends on Laurel Street, Waterbury, until he was driven to a convenience store around midnight. While at the convenience store, Alvarez claimed that

---

[3] The video surveillance tape was never marked for identification and, as the Appellate Court correctly found, was not part of the trial record. Even if it was part of the record, it must be noted that the video tape would show nothing more than Alvarez in a convenience store in Waterbury at midnight- which is approximately one hour and twenty minutes before the murder.

7

he was videotaped by surveillance cameras and that his attorney
had obtained a copy of that video tape.[4]

Hunter attempted during his case-in-chief to call witnesses
to testify as alibi witnesses for Alvarez.  The state requested
an offer of proof when Hunter called Karen White to the stand.
The defense replied that the alibi witnesses and the video
surveillance tape would corroborate Alvarez's testimony.  The
court asked defense counsel for authority for "having someone
come in and testify as alibi [sic] witness for another witness."
(T. 1/28/99 at 151).  Counsel responded that the authority lies
in the fact that the evidence corroborates Alvarez's testimony,
and therefore was admissible.  The trial court replied that the
evidence was not "relevant to this case....  I don't think that
we can keep going off and branching off and branching off and get
everybody else to come in and say yes they saw her with another
witness."  Id. at 152.  The court went further to state that,
"[Alvarez] has testified, the jury can believe [him] or not
believe [him]."  Id.

The court took a brief recess and then ruled that none of
Alvarez's alibi witnesses could testify and that the video
surveillance tape would not be admitted into evidence.  In
respect to the proposed testimony of Alvarez's alibi witnesses,
the court stated:

---

[4] See footnote 2.

8

"The court is going to rule that the testimony of [the alibi witness] is beyond the scope of this particular trial. It starts another trial within a trial. Frankly, once you open that floodgate, then the state can bring in [other evidence] to show where [Alvarez] was at that time...."

(T. 1/28/99 at 154).

Petitioner's counsel then stated that he was prepared to call three other witnesses, in addition to Karen White, in support of Alvarez's alibi and noted that each of the witnesses was present in the courthouse. (T. 1/28/99 at 154). Hunter's counsel then stated his intention to offer into evidence the video surveillance tape. Id. The trial court remarked that Alvarez had already testified as to his whereabouts on the night of the murder and reiterated "I'm not going to [allow the Alvarez alibi evidence] in this court." Id. Petitioner's counsel later asked the court to reconsider its ruling that prohibited the introduction of Alvarez's alibi witnesses and the video surveillance tape. In response to this request, the trial court stated "I'll reconsider and rule the same way." (T. 1/29/99 at 32-33).

On February 1, 1999, after a trial by jury, Hunter was convicted of murder, in violation of General Statutes §53a-54a(a), and was thereafter sentenced in the Superior Court for the Judicial District of Waterbury by the Honorable Charles D. Gill to a term of 52 years in prison.

9

## II.  DIRECT APPEALS

On direct appeal to the Connecticut Appellate Court, Hunter claimed that the trial court violated both his right to confrontation and his right to present a complete defense when it excluded evidence offered by Hunter to show that Jesus Alvarez was not present when Addies Grimsley was murdered.  State v. Hunter, 62 Conn.App. 767, 771-73 (2001).

Hunter claimed that, by excluding the evidence in support of Alvarez's alibi, the trial court "improperly prevented him from fully and fairly exercising his right to confront and cross-examine the state's key witness, Alvarez."  State v. Hunter, 62 Conn.App. at 771.  The Appellate Court disagreed and held that the trial court "did not infringe on [Hunter's] constitutional right to confrontation."  Id. at 773.  The Appellate Court further explained:

> On cross examination, [Hunter] inquired about Alvarez's whereabouts on the afternoon and the evening of October 12 and the morning of October 13, 1997. [Hunter] questioned the witness in detail, and the witness stated his alibi to the jury.  His answers were clear and specific.

Id.  The Appellate Court found that Hunter's right to confrontation was not violated because Hunter "had an opportunity to cross-examine fully and fairly did so," and, therefore, the trial court "did not abuse its discretion because it did not deny or unduly restrict [Hunter's] right to cross-examine the witness."  Id.

10

Hunter's second claim was that the trial court denied him his constitutional right to present a defense. Hunter claimed that the testimony of Alvarez's alibi witnesses and a video surveillance tape that was said to have shown Alvarez in a convenience store at about midnight on the night of the murder was improperly excluded by the trial court. State v. Hunter, 62 Conn.App. at 773. The Appellate Court again disagreed and held that the trial court did not abuse its discretion in excluding the Alvarez alibi evidence because it was not "legally relevant." Id. at 775.

Hunter argued that the evidence was relevant because it enabled the jury to assess the reliability of Alvarez's sworn statement, which was admitted into evidence pursuant to the Whelan doctrine. The Appellate Court noted that to be admissible, evidence "must be logically and legally relevant." Id. The court further explained that:

It is not logical relevance alone, however, that secures the admission of evidence. Logically relevant evidence must also be legally relevant . . . that is, not subject to exclusion for any one of the following prejudicial effects: (1) where the facts offered may unduly arouse the jury's emotions, hostility or sympathy, (2) *where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues,* (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it.

(Emphasis in original.)  State v. Hunter, 62 Conn.App. at 774 (quoting State v. Joly, 219 Conn. 234, 260-61 (1991)).

The Appellate Court then held that the admission of evidence to support Alvarez's alibi would have created a collateral issue "that would have distracted the jury from the main issue." State v. Hunter, 62 Conn.App at 775.   The Appellate Court reasoned that by "allowing the admission of this evidence and the examination of the alibi witnesses proposed by the defendant, the court would have opened the door to several trials within a trial." Id.

The Connecticut Supreme Court denied Hunter's petition for certification to appeal from the judgment of the Appellate Court on June 7, 2001.   State v. Hunter, 256 Conn. 925 (2001).

## LEGAL ANALYSIS

### I.  The Standard of Review

To determine whether Petitioner is entitled to federal habeas relief, the Court must address the proper habeas corpus review standard under the Antiterrorism and Effective Death Penalty Act ("AEDPA").

In enacting AEDPA, Congress significantly "modifie[d] the role of federal habeas courts in reviewing petitions filed by state prisoners." Williams v. Taylor, 529 U.S. 362, 403 (2000). "AEDPA changed the landscape of federal habeas corpus review by 'significantly curtail[ing] the power of federal courts to grant the habeas petitions of state prisoners.'" Eze v. Senkowski, 321 F.3d 110, 120 (2d Cir. 2003) (quoting Lainfiesta v. Artuz, 253

12

.3d 151, 155 (2d Cir. 2001).  AEDPA imposed a more rigid standard of review, as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) ... was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1)-(2).[5]

## III.  APPLICATION

### A.    On the Merits

AEDPA's deferential standard is limited to claims that were "adjudicated on the merits in State court proceedings."  28 U.S.C. § 2254(d).  Where a state court has failed to adjudicate a claim on the merits, the federal habeas court applies the "pre-

---

[5] AEDPA's standards for reviewing state court findings and conclusions apply to any petition filed, as Petitioner's was, after April 24, 1996, AEDPA's effective date.  Williams v. Taylor, 529 U.S. at 402.

- 13

AEDPA standards, and reviews *de novo* the state court disposition of the petitioner's federal constitutional claims." <u>See</u> <u>Eze</u>, 321 F.3d at 121 (quoting <u>Aparicio v. Artuz</u>, 269 F.3d 78, 93 (2d Cir.2001)); <u>Washington v. Schriver</u>, 255 F.3d 45, 55 (2d Cir. 2001). To adjudicate a claim on the merits, the state court "need not mention the argument raised or cite relevant case law." <u>Brown v. Artuz</u>, 283 F.3d 492, 497 (2d Cir. 2002). The state court is not even required to explain its reasoning process, although the Second Circuit has observed that a state court's explanation of its reasoning process would ease the burden of the federal courts in applying the "unreasonable application" and "contrary to" tests. <u>See</u> <u>Sellan v. Kuhlman</u>, 261 F.3d 303, 311 (2d Cir. 2001). ·<u>See also</u> <u>Aycox v. Lytle</u>, 196 F.3d 1174, 1178 n. 3 (10th Cir. 1999) (noting that the "state court's explanation of its reasoning would avoid the risk that we might misconstrue the basis for the determination, and consequently diminish the risk that we might conclude the action unreasonable at law or under the facts at hand....").

As the Second Circuit has stated, a state court "adjudicate[s]" a state prisoner's federal claim on the merits when it "(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." <u>Id.</u> at 312. To determine whether a claim has been disposed of on the merits, the court considers:

> "(1) what the state courts have done in similar cases; (2)
> whether the history of the case suggests that the state

14

court was aware of any ground for not adjudicating the case
on the merits; and (3) whether the state court opinion
suggests reliance upon procedural grounds rather than a
determination on the merits."

Eze, 321 F.3d at 121; Sellan, 261 F.3d at 314 (quoting Mercadel
v. Cain, 179 F.3d 271, 274 (5th Cir. 1999)).

Additionally, the state court need only dispose of the
petitioner's federal claim on substantive, rather than procedural
grounds, and reduce that disposition to judgment.  See Eze, 321
F.3d at 122.  Moreover, an issue may be determined to be
adjudicated on its merits "even when the state court does not
specifically mention the claim but uses general language
referable to the merits."  Norde v.  Keane, 294 F.3d 401, 410 (2d
Cir. 2002).

The Connecticut Appellate Court's decision in this case
supports the conclusion that the Appellate Court was fully aware
of the federal nature of Hunter's  claims.  The Appellate Court
noted in the opening paragraph that Hunter "contend[ed] on appeal
that the trial court improperly denied him his constitutional
rights to confrontation and to present a defense."  State v.
Hunter, 62 Conn.App. at 768.  As to the first claim, after
discussing the proper standard of review for Sixth Amendment
claims, the Appellate Court held that "in this case, the court
did not infringe on the defendant's constitutional right to
confrontation."  Id. at 773.  In disposing of the second claim,
that Hunter was denied his constitutional right to present a

15

defense, the Appellate Court identified and applied the
appropriate standard of review and held that "the alibi witnesses
for Alvarez and the convenience store video surveillance tape
were not relevant" to Hunter's case. Id. at 774. This language
demonstrates that the Appellate Court disposed of the claim on
substantive grounds. See Eze, 321 F.3d at 122 (holding that the
New York Appellate Division adjudicated the petitioner's federal
claim on the merits because "the record does not support the
contentions of the defendant that...he was denied effective
assistance of counsel); Aparicio, 269 F.3d at 94 (holding that
the New York Appellate Division adjudicated the petitioner's
federal claims on the merits because "there is nothing in its
decision to indicate that the claims were decided on anything but
substantive grounds."). Therefore, under the established law of
this Circuit, the Appellate Court adjudicated Hunter's federal
claims of the denial of his constitutional rights to
confrontation and to present a defense on the merits so as to
trigger § 2254(d)(1)'s deferential standard of review.


B.    **Clearly Established Federal Law**

The "contrary to" and "unreasonable application" clauses
of § 2254(d)(1) have "independent meaning." Williams v. Taylor,
529 U.S. at 404-05. Both clauses, however, "restrict[ ] the
source of clearly established law to [the Supreme] Court's

16

jurisprudence."  <u>Id</u>. at 412.  Section 2254(d)(1)'s "clearly

established" phrase "refers to the holdings, as opposed to the

dicta, of [the Supreme] Court's decisions as of the time of the

relevant state-court decision."  <u>Id</u>.  In other words, "clearly

established Federal law" under § 2254(d)(1) is the governing

legal principle or principles set forth by the Supreme Court at

the time the state court renders its decision.  <u>See id.</u>, at 405,

413.  Therefore, the Court must initially determine whether

Hunter's claim that the exclusion of alibi witnesses for Alvarez

and the convenience store video surveillance tape is based on

"Federal law 'clearly established' by the Supreme Court."

<u>Sellan</u>, 261 F.3d at 309.

    Hunter claims that the trial court's ruling that prohibited

him from presenting the witnesses and the surveillance tape to

support Alvarez's alibi deprived Hunter of his constitutional

right to present a complete defense.  "Supreme Court precedent

makes clear that a criminal defendant is entitled by the

Constitution to a meaningful opportunity to present a complete

defense."  <u>Wade v. Mantello</u>, 2003 WL 2136185, *4 (2d Cir. 2003);

<u>see also</u> <u>Jones v. Stinson</u>, 229 F.3d 112, 120 (2d Cir. 2000)

(stating the "opportunity to present a defense is one of the

constitutional requirements of a fair trial.") (citing <u>Crane v.

Kentucky</u>, 476 U.S. 683, 690 (1986)); <u>Rock v. Arkansas</u>, 483 U.S.

44, 51-53 (1987)).  "Few rights are more fundamental than that of

17

an accused to present witnesses in his own defense." <u>Chambers v.</u>
<u>Mississippi</u>, 410 U.S. 284, 294 (1973). "The right to call
witnesses in order to present a meaningful defense at a criminal
trial is a fundamental constitutional right secured by both the
Compulsory Process Clause of the Sixth Amendment and the Due
Process Clause of the Fourteenth Amendment." <u>Washington v.</u>
<u>Schriver</u>, 255 F.3d 45, 56 (2d Cir. 2001) (citing <u>Chambers</u>, 410
U.S. at 294).

The right to present relevant evidence secured by a
defendant in a criminal trial, however, "is not unlimited, but
rather is subject to reasonable restrictions." <u>United States v.</u>
<u>Scheffer</u>, 523 U.S. 303, 308 (1998); <u>see also</u> <u>Taylor v. Illinois</u>,
484 U.S. 400, 410 (1987); <u>Rock</u>, 483 U.S. at 55; <u>Chambers</u>, 410
U.S. 295. State and federal rules of procedure and evidence
"designed to assure both fairness and reliability in the
ascertainment of guilt and innocence" are central among these
restrictions. <u>Chambers</u>, 410 U.S. at 302; <u>see also</u> <u>Crane</u>, 476
U.S. at 690; <u>Wade</u>, 2003 WL 21361685, at *5. "The power of courts
to exclude evidence through the application of evidentiary rules
that serve the interests of fairness and reliability is well-
settled." <u>Wade</u>, 2003 WL 21361685 at *5. <u>See</u> <u>Taylor v. Illinois</u>,
484 U.S. at 410 ("The accused does not have an unfettered right
to offer testimony that is incompetent, privileged, or otherwise
inadmissible under standard rules of evidence.")

18

Thus, the Supreme Court has held constitutional evidentiary rules that, while excluding evidence, still serve legitimate interests in the criminal trial process.  For example, in Scheffer, the defendant, Scheffer, was an airman for the United States Air Force who was prosecuted for using illegal drugs. Scheffer denied the charges and claimed that he unknowingly ingested the methamphetamine that a urinalysis test showed he had ingested.  Scheffer offered the results of a polygraph examination in support of his claim that he had unknowingly ingested the drug.  The Air Force judge presiding over the court martial excluded the evidence pursuant to Rule 707 of the Military Rules of Evidence, which, *inter alia*, prohibits the introduction of the results of a polygraph examination.  The Court found that "Rule 707 serves several legitimate interests in the criminal process."  Scheffer, 523 U.S. at 309.  The Court stated that these legitimate interests included "ensuring that only reliable evidence is introduced at trial, preserving the court members' role in determining credibility, *and avoiding litigation that is collateral to the primary purpose of the trial*."  (emphasis added) Id.  The Court found that Scheffer was able to fully present his version of the facts to the finders of fact and the evidentiary rule did not preclude Scheffer from introducing any factual evidence because the polygraph results would only bolster Scheffer's credibility.  Id. at 317.  The

19

Court determined that Scheffer's defense was not significantly impaired by the exclusion of the evidence and, therefore, the rule was constitutional.

Accordingly, "state and federal rule makers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." Id. at 308. These rules do not unconstitutionally restrict an accused's right to present a defense "so long as they are not arbitrary or disproportionate to the purposes they are designed to serve." Id. (internal quotations omitted) (citing Rock, 483 U.S. at 56). A state may not, therefore, apply arbitrary rules to prevent a material witness from testifying for the defense. Rock, 483 U.S. at 55. Moreover, the exclusion of evidence is "unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." Scheffer, 523 U.S. at 308.

Consistent with the foregoing authorities, this Court concludes that Hunter's claim is based upon clearly established federal law, as determined by the Supreme Court. A criminal defendant is protected by the Constitution from the arbitrary exclusion of relevant evidence. Therefore, this Court must determine whether the state court's decision was "contrary to" or an unreasonable application of" this clearly established federal law.

20

C.    **Contrary To**

A state court decision is contrary to clearly established Supreme Court precedent if the state court applies a rule that contradicts the governing law set forth in the Supreme Court cases. See Williams v. Taylor, 529 U.S. at 405. "Contrary" retains its commonly understood meaning of "diametrically different," "opposite in nature," or "mutually opposed." Id. Therefore, § 2254 requires that the state court's decision must be "substantially different from the relevant precedent" of the Supreme Court. Id. Additionally, a state court decision will be contrary to the Supreme Court's clearly established precedent if the state court confronts a set of facts "that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." Id. at 406.

While the "general contours of a criminal defendant's right to present potentially exculpatory evidence" has been clearly established by Supreme Court precedent, the Second Circuit has noted that the Supreme Court has not "articulated the specific set of circumstances under which a criminal defendant must be permitted to introduce evidence" of a potentially exculpatory nature. Wade, 2003 WL 21361685, at *5. The Supreme Court has only stated that such evidence must be admitted when its exclusion deprived the defendant of a fair trial under the "facts

21

and circumstances" of the individual case. <u>Chambers</u>, 410 U.S. at 303; <u>Wade</u>, 2003 WL 21361685, at *5. The Appellate Court recognized a defendant's right to present a defense, but in adjudicating Hunter's claim did not reach a different or opposite conclusion than the Supreme Court. <u>See</u> <u>e.g.</u>, <u>U.S. v. Scheffer</u>, 523 U.S. 303 (1998) (ruling polygraph inadmissible as collateral to primary purpose of trial). Additionally, the Appellate Court did not arrive at a decision different from the Supreme Court's on "materially indistinguishable" facts. Thus, this court concludes that the state court's decision was not "contrary to" Supreme Court precedent. <u>See</u> <u>Williams v. Taylor</u>, 529 U.S. at 412-413.

### D.   <u>Unreasonable Application</u>



This court must next determine whether the Appellate Court's decision constituted an "unreasonable application of" clearly established federal law governing a criminal defendant's right to present a complete defense. As to the "unreasonable application" clause, the Supreme Court in <u>Williams v. Taylor</u> explained that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u> at 413. However, "[t]he term

22

'unreasonable' is ... difficult to define." <u>Id.</u> at 410.   The

Supreme Court made clear that "an unreasonable application of

federal law is different from an incorrect application of federal

law." <u>Id.</u>  Rather, the issue is "whether the state court's

application of clearly established federal law was objectively

unreasonable." <u>Id.</u> at 409.

The Second Circuit has further explained "that while '[s]ome

increment of incorrectness beyond error is required ... the

increment need not be great; otherwise, habeas relief would be

limited to state court decisions so far off the mark as to

suggest judicial incompetence.'"  <u>Jones v. Stinson</u>, 229 F.3d 112,

119 (2d Cir. 2000) (quoting <u>Francis S. v. Stone</u>, 221 F.3d 100,

111 (2d Cir. 2000)).

Moreover, the Second Circuit has held "that a state court

determination is reviewable under AEDPA if the state decision

unreasonably failed to extend a clearly established, Supreme

Court defined, legal principle to situations which that principle

should have, in reason, governed." <u>Kennaugh v. Miller</u>, 289 F.3d

36, 45 (2d Cir. 2002); <u>accord</u> <u>Yung v. Walker</u>, 296 F.3d 129, 135

(2d Cir. 2002).

Recently, the Second Circuit articulated the proper test for

a case such as Hunter's.  In <u>Wade</u>, the Second Circuit stated that

the question of whether the omitted evidence would have created

reasonable doubt may be "premature if the trial court's ruling

23

was proper." <u>Id.</u> at *6. The Appellate Division in <u>Wade</u> rejected Wade's claim not because the excluded evidence, if admitted, would not have created reasonable doubt, but because it found that the trial court properly excluded the testimony." <u>Id.</u> Consequently, habeas relief may not be granted unless this determination was objectively unreasonable." <u>Id.</u> This Court is bound by <u>Wade</u> and must therefore determine whether the Appellate Court's determination to exclude the evidence Hunter sought to admit was objectively unreasonable and not whether reasonable doubt would have been created had the evidence been admitted.

The Supreme Court has typically found the Constitution to be principally (but not always) concerned with state evidentiary rules leading to the blanket exclusion of categories of evidence when their application is arbitrary or disproportionate to the purposes the rules are designed to serve." <u>Wade</u>, 2003 WL 21361685 at *7 (internal quotes and citations omitted). The evidentiary issue in this case does not involve the application of such a rule. Rather, this case involves one of those "ordinary evidentiary ruling[s] by state trial courts" concerning the admissibility of evidence. <u>Crane</u>, 476 U.S. at 689. The Court is therefore "traditional[ly] reluctan[t] to impose constitutional constraints." <u>Id.</u> As the Supreme Court has explained:

> In any given criminal case the trial judge is called upon to
> make dozens, sometimes hundreds, of decisions concerning the

24

> admissibility of evidence. As we reaffirmed earlier this
> Term, the Constitution leaves to the judges who must make
> these decisions "wide latitude" to exclude evidence that is
> "repetitive ..., only marginally relevant" or poses an undue
> risk of "harassment, prejudice, [or] confusion of the
> issues."

Crane, 476, U.S. at 689-90 (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986) (alterations in Crane); Wade, 2003 WL 21361685 at *7.

The defense proffered that Alvarez was not in the Toyota at the time of the shooting and therefore could not identify Hunter as the person who shot and killed Grimsley.  Hunter submitted that four people would testify as alibi witnesses for Alvarez and that the video surveillance tape would allow the jury to find that Alvarez was not in the Toyota at the time of the killing. For this evidence to have a significant impact on the trial the jury would have had to find Alvarez and his alibi witnesses credible, that the police officers fabricated a statement and coerced Alvarez into signing the statement while Alvarez was under the influence of drugs and had no knowledge as to the statement's contents, and that the officers testifying before the trial court committed perjury in regard to Alvarez's statement.

Given Hunter's conviction, it is clear that the jury credited the testimony of the State's witnesses.  As such, this Court finds no indication that the testimony of Alvarez's alibi witnesses and the video surveillance tape would have persuaded the jury to believe that the police employed illegal tactics in

order to arrest and convict Hunter.

The trial court here excluded the convenience store video surveillance tape and the testimony of Alvarez's alibi witnesses because it determined that the evidence was "not relevant to the case." (T. 1/28/99 at 152). The trial court concluded that the testimony of such witnesses and the video surveillance tape were "beyond the scope of this particular trial. It starts another trial within a trial." (T. 1/28/99 at 154).

During argument before the trial court, outside the presence of the jury, defense counsel stated that Alvarez was convicted because Alvarez was in the Toyota, but on the witness stand in Hunter's trial he said that he was innocent. (T. 1/28/99 at 150-51). The defense then argued that, since Alvarez was claiming his innocence, the defense counsel for Hunter was "entitled to present the witnesses [Alvarez] would have presented had he tried the case himself." (T. 1/28/99 at 151).

The jury, as the finder of fact in Hunter's case, would have been unduly distracted by this evidence. Defense counsel demonstrated by his own argument that the witnesses were to be presented on behalf of Mr. Alvarez. The witnesses were to testify to Alvarez's whereabouts at the time of the murder and had no knowledge of Hunter's whereabouts. Therefore, the litigation of that collateral issue was not only a possibility, but was the **actual purpose of** the proffered evidence.

26

The limited probative value of the proffered evidence is weighed against the dangers that the testimony could confuse or mislead the jury. The trial court was evidently concerned that a trial within a trial would commence if the proffered evidence was admitted. The jury might become consumed with the question of Alvarez's guilt or innocence because, as defense counsel stated, the witnesses were to be presented because Alvarez claimed he was innocent. Speculation as to whether an innocent man was already incacerated posed a danger of turning the jury's attention away from the issues of Hunter's culpability to those of Alvarez's culpability and/or possible police misconduct.

The trial court viewed the limited relevance of this evidence and considered the countervailing dangers its admission would pose. Therefore, the trial court's decision to exclude the evidence was not "arbitrary." Scheffer, 523 U.S. at 308. Additionally, the Appellate Court properly took into account the legitimate interest of, among others, preventing the creation of a side issue that would unduly distract the jury from the main issues. See Hunter, 62 Conn. App. at 774. Therefore, the Appellate Court's determination that the trial court's evidentiary ruling did not violate Hunter's right to present a defense because the legitimate interests served by the exclusion of such evidence outweighed the minimal probative value of the proffered evidence, and that the evidence was irrelevant to

27

Hunter's case, was not objectively unreasonable.


## CONCLUSION

An accused's right to present a defense is a fundamental component of our criminal justice system. See Chambers, 410 U.S. at 294. The right to present a defense is not limitless, however, as it is subject to reasonable restrictions. See Scheffer, 523 U.S. at 308. Restricting the right to present a defense by denying the admission of evidence that would create a side issue that would unduly distract the jury from the main issues is of the utmost concern to trial courts. Evidence that would essentially create a trial or number of trials within a trial can simply not be admitted. Accordingly, Petitioner's Motion [Doc. no. 1] is DENIED.


SO ORDERED

ELLEN BREE BURNS

SENIOR UNITED STATES DISTRICT JUDGE


Dated at New Haven, Connecticut this _18_ day of September, 2003.


28